UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BCG MASONIC CLEVELAND, LLC f/k/a TempleLive Cleveland, LLC | ) CASE NO. ) ) JUDGE: |
| Plaintiff, | ) ) |
| v. | ) **COMPLAINT** |
| LIVE NATION ENTERTAINMENT, INC.; and LIVE NATION WORLDWIDE, INC. | ) ) (Jury Demand Endorsed Herein) ) ) |
| Defendants | ) |

Now comes the Plaintiff, BCG Masonic Cleveland, LLC (f/k/a TempleLive Cleveland, LLC), (referred to herein as "TempleLive" or "Plaintiff"), and for its Complaint against Live Nation Entertainment, Inc. and Live Nation Worldwide, Inc., states as follows:

1. Plaintiff is an Arkansas limited liability company with its principal place of business in Rogers, Benton County, Arkansas. Plaintiff owns and operates a venue in Cleveland, Ohio, that does business as Masonic Cleveland – TempleLive.

2. Defendant Live Nation Entertainment, Inc. ("LYV") is a New York Stock Exchange publicly traded company incorporated under the laws of the State of Delaware, with its principal place of business in Beverly Hills, California.

3. Defendant Live Nation Worldwide, Inc. ("LNW") is a Delaware corporation, with its principal place of business in Beverly Hills, California.

4. LNW is a subsidiary of LYV, which at all relevant times acted under the tradename "Live Nation" and without distinction from the identity of LYV, was its publicly traded parent. Accordingly, TempleLive asserts on information and belief that LYV and LNW are proper party-defendants. LYV and LNW will be referred to collectively herein as "Live Nation."

5. Live Nation and non-party Ticketmaster LLC ("Ticketmaster"), a Virginia limited liability company with its principal place of business in Beverly Hills, California, are affiliates as a result of a certain merger transaction described hereafter (Live Nation and Ticketmaster are referred to collectively as the "LVN parties").

6. The LVN parties' financial results of operations are reflected in Live Nation's consolidated public financial statements.

7. This case involves an amount in controversy exceeding $75,000.00, exclusive of costs and other items which may be excluded when determining federal jurisdiction.

8. Plaintiff and Defendants are residents of different states as determined under the federal diversity jurisdiction laws.

9. Accordingly, this Court has diversity jurisdiction over Plaintiff's claims against Defendants pursuant to 28 U.S.C. § 1332(a).

10. This Court has personal jurisdiction over the parties as the parties have engaged in contacts with this District and Division through operating venues, booking, promoting and/or selling tickets to music and other entertainment events in Cleveland, Ohio. Live Nation further has engaged in substantial specific contacts with this state and district by negotiating, entering into and performing certain contractual obligations with TempleLive. Based on its specific and general activities, Live Nation is subject to general and specific jurisdiction within this State and District.

11. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

### a. *TempleLive*

12. In recent years, TempleLive, its parent Beaty Capital Group, Inc., and/or other affiliates have undertaken several forward-thinking projects that revitalized and developed historical properties across the country into live entertainment and meeting venues.

13. Relevant to this Action, in or around 2018, TempleLive acquired and transformed one of Cleveland's oldest and most enigmatic landmarks, the Cleveland Masonic Temple, from a decaying, largely unused property, into a multi-use entertainment and event facility containing over 100,000 square feet of space and a performance auditorium with approximately 2,500 seats.

14. Prior to the global Covid-19 pandemic, in just a couple of shortened seasons, TempleLive hosted renowned music and comedy acts, including MGMT, Bastille, Umphreys McGee, Fitz and the Tantrums, Bob Weir, the 1975, the Pixies, Sturgill Simpson, Joe Rogen, and many others.

15. Relevant to this action, since TempleLive's acquisition, Live Nation booked forty-one (41) events that were conducted at TempleLive, generating ticketing, food and beverage, parking, and other revenues for TempleLive (as well as the LVN parties).

16. TempleLive easily has the capability to hold 80 or more events per year.

17. In reliance on past, current and future events, contracts, and contractual expectancies, TempleLive has entered into contracts and begun development of a world-class hotel facility adjacent to its performance auditorium.

#### b. *Live Nation and Ticketmaster*

18. In the past decades, Live Nation collaborated with Ticketmaster to establish a collective dominance over every aspect of the live music entertainment business, including owning, operating, and exclusively booking venues; booking specific artists, tours, and festivals; representing acts, venues, and events in various respects; conducting events; and generating ancillary revenues like food, beverage, parking, and merchandise.[1] The LVN parties have also controlled the event ticketing market, generating staggeringly large primary and secondary market ticket revenues primarily through Ticketmaster.[2]

19. This collective dominance has resulted in publicly reported criticism among artists, venues, and fans over the years. See e.g. Jennifer Oliver, *Ticketmaster, Live Nation Get Booed: Concert-Goers File Class Action for "Unchecked" Abuse of Power*, The National Law Review, Vol. XI, Number 50 (May 5, 2020) (A copy of the article is attached hereto as Exhibit 1). The LVN parties' actions have led to extensive litigation regarding ticketing practices, as well as Department of Justice litigation and federal court judgments directed at the LVN parties' anti-competitive and coercive practices, the latter of which will be further described hereafter.[3]

20. In a recent Annual 10-K Report submitted to the Securities Exchange Commission, Live Nation said this about its consolidated operations:

> ***We believe we are the largest producer of live music concerts in the world***, based on total fans that attend Live Nation events as compared to events of other promoters, connecting nearly 98 million fans to more than 40,000 events for over 5,000 artists in 2019. Live Nation owns, operates, has exclusive booking rights for or has an equity interest in 273 venues, including House of Blues® music venues and prestigious locations such as The Fillmore® in San Francisco, the Hollywood

---

[1] Live Nation averaged concert revenue of more than $9 billion per year in 2018 and 2019. Live Nation Form 10-K for December 31, 2019 at page 89.
[2] Live Nation averaged ticketing revenue of more than $1.5 billion per year in 2019 and 2019.
[3] Ticketmaster's history of maximizing ticket fees, controlling ticket availability, and allegedly encouraging and profiting from the reselling of tickets through "secondary markets" have been both criticized and the subject of various class action lawsuits reported in Live Nation's annual report and financial statements. *See* Live Nation Form 10-K, December 31, 2019, Note 7 to Financial Statements, page 81.

4

Palladium, the Ziggo Dome in Amsterdam, 3Arena in Ireland, Royal Arena in Copenhagen and Spark Arena in New Zealand. We believe we are one of the world's leading artist management companies based on the number of artists represented. Our artist management companies manage music artists and acts across all music genres. As of December 31, 2019, we had nearly 110 managers providing services to more than 500 artists.

***We believe we are the world's leading live entertainment ticketing sales and marketing company, based on the number of tickets we sell.*** Ticketmaster provides ticket sales, ticket resale services and marketing and distribution globally through www.ticketmaster.com and www.livenation.com and our other websites, mobile apps, numerous retail outlets and call centers, selling over 485 million tickets in 2019 through our systems. Ticketmaster serves nearly 11,500 clients worldwide across multiple event categories, providing ticketing services for leading arenas, stadiums, festival and concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters.

We believe ***our global footprint is the world's largest music advertising network*** for corporate brands and includes one of the world's leading ecommerce websites, based on a comparison of gross sales of top internet retailers.

Live Nation Form 10-K, December 31, 2019 at 2 (emphasis supplied).

21. Throughout its 2019 Annual Report, Live Nation elaborated how the LVN parties expand their consolidated income and market dominance, stating among other things:

As a promoter, we earn revenue primarily from the sale of tickets and pay artists under one of several formulas, including a fixed guaranteed amount and/or a percentage of ticket sales or event profits. For each event we promote, we either use a venue we own or operate, or rent a third-party venue. Revenue is generally impacted by the number of events, volume of ticket sales and ticket prices.

*Id.* at 5 (Live Nation further explains its business here and throughout its Annual Report).

### c. *Live Nation's Overzealous Anti-Competitive Behavior*

22. Live Nation and Ticketmaster were not always affiliated under the Live Nation corporate umbrella.

23. Up through 2007, Live Nation was Ticketmaster's largest customer. However, that year, Live Nation announced it would not renew its ticketing agreement with Ticketmaster, and the two companies supposedly would become direct competitors.

24. That "competition" did not last long, and on February 10, 2009, Live Nation and Ticketmaster announced their merger.

25. The anti-competitive nature of the merger led state and federal government agencies to allege violations of Section 7 of the Clayton Act, 15 U.S.C. 18.

26. The merger thus spawned a 2010 federal Antitrust lawsuit by the United States of America and various states ("Plaintiff States") in the District Court of the District of Columbia. *United States of America, et al. v. Ticketmaster Entertainment, Inc. & Live Nation Entertainment, Inc.* Case No. 1:10-cv-00139-RMC ("The Antitrust Case").

27. The United States, Plaintiff States, and the LVN parties (collectively the "Antitrust Parties") ultimately agreed to the entry of a Final Judgment (The "Final Judgment") in 2010.

28. In late 2019, the Department of Justice sought to clarify, amend and extend the Final Judgment, stating in a Press Release:

> The 2010 Final Judgment permitted Live Nation to merge with Ticketmaster but prohibited the company from retaliating against concert venues for using another ticketing company, threatening concert venues, or undertaking other specified actions against concert venues for ten years. ***Despite the prohibitions in the Final Judgment, Live Nation repeatedly and over the course of several years engaged in conduct that, in the Department's view, violated the Final Judgment. To put a stop to this conduct and to remove any doubt about defendants' obligations under the Final Judgment going forward, the Department and Live Nation have agreed to modify the Final Judgment to make clear that such conduct is prohibited.*** In addition, Live Nation has agreed to extend the term of the Final Judgment by five and a half years, which will allow concert venues and American consumers to get the benefit of the relief the Department bargained for in the original settlement. The proposed modifications to the Final Judgment will also help deter additional violations and allow for easier detection and enforcement if future violations occur.

Department of Justice Press Release, Dec. 19, 2019 https://www.justice.gov/opa/pr/justice-department-will-move-significantly-modify-and-extend-consent-decree live#:~:text=The%202010%20Final%20Judgment%20permitted,concert%20venues%20for%20ten%20years. (emphasis supplied). Thereafter, on January 28, 2020, the Antitrust Parties entered

6

an Amended Final Judgment in the Antitrust Case (The Amended Final Judgment is attached hereto as Exhibit 2).

29. While the Final Judgment and Amended Final Judgment speak for themselves, the Amended Final Judgment prohibits retaliation by Live Nation and Ticketmaster, intending to promote competition and prevent their coercive conduct against venues and protected parties. The Amended Final Judgment thus restricts the LVN parties' conduct in ticketing, scheduling, and promoting and managing artists and venues, among other business generally referred to as live entertainment events and primary ticketing services.

30. Live Nation also paid several million dollars in partial resolution of the Antitrust Case.

31. The Department of Justice says Live Nation is now operating under "the most significant enforcement action" of an existing antitrust consent decree in its history.

32. The Antitrust Case Final Judgment and Amended Final Judgment have been in effect at all times relevant to this Action.

33. Notwithstanding the Amended Final Judgment, the continued dominance of Live Nation is noted in a in a recent publicly-released letter to the President of the United States, Joseph Biden, Live Nation touted "We represent businesses, workers and entertainers that make up the *majority of the live event industry.*" https://www.livenationentertainment.com/2021/01/u-s-live-event-industry-comes-together-to-offer-collective-covid-19-vaccination-infrastructure-and-staff-in-letter-to-president-biden-2/ (emphasis supplied).

34. These claims do not go unnoticed by independently owned venues, unrepresented artists, and homegrown promoters, ticket sellers, and operators.

35. Live Nation's annual report trumpets further notice of its competitive focus:

In markets where we own or operate a venue, *we compete* with other venues to serve artists likely to perform in that general region. Consequently, touring artists have various alternatives to our venues when scheduling tours. *Our main competitors* in venue management include ASM Global, The Madison Square Garden Company, The Nederlander Organization and Bowery Presents, *in addition to numerous smaller regional companies in North America,* Europe and Australia/New Zealand.

\* \* \* \* \* \*

*We experience competition* from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events. Resale, or secondary, ticketing services have created more aggressive buying of primary tickets whereby certain brokers are using automated internet "bot" technology to attempt to buy the best tickets when they go on sale, notwithstanding federal and state prohibitions.

36. These historical situations and acts by Live Nation are relevant to its motive, opportunity, plan, knowledge and absence of mistake in connection with the actions forming the basis of this suit.

### d. TempleLive's relationship with Live Nation in Cleveland

37. When TempleLive entered the Cleveland market in around 2018, it was in the market for various services related to facilities operation, booking, promotion, ticketing, and other operational needs.

38. At relevant times, Live Nation's business preference has been to utilize Ticketmaster to sell tickets to applicable events. Accordingly, in 2018, TempleLive, Live Nation, and Ticketmaster (the "TL/LVN Parties") entered into and/or were intended beneficiaries of certain agreements[4] whereby all TempleLive events were booked, promoted, ticketed, and conducted exclusively by the LVN parties.

---

[4] In relevant part, prior to its name change to BCG Masonic Cleveland, LLC, TempleLive Cleveland, LLC entered into a certain Booking Agreement with LNW. TempleLive's affiliate TLI Entertainment entered into a User Agreement with Ticketmaster.

8

39. Certain disputes eventually arose between the TL/LVN Parties, leading them to engage in discussions directly and through counsel in the summer of 2019.

40. The TL/LVN Parties entered into a Confidential Settlement Agreement (the "Settlement Agreement"), whereby they released each other from any claims for additional compensation.

41. Under the Settlement Agreement, the LVN parties fully released TempleLive from any further financial claims. While the Settlement Agreement allows the disclosure of its contents as required to enforce its terms, in an abundance of caution, TempleLive is not attaching a copy of the Settlement Agreement to this public filing, as this action does not arise wholly out of the Settlement Agreement.[5]

42. On information and belief, the Settlement Agreement resulted in Ticketmaster's recognizing certain expenses under applicable accounting rules.

43. Under the Settlement Agreement, TempleLive ceased using Live Nation for managing, booking, and promoting of events.

44. TempleLive was therefore left to compete against Live Nation (and others) for artists, tours, and events. Live Nation controlled other tours and artists that would have been suitable acts to perform at TempleLive.

45. TempleLive's relieving Live Nation of its duties under the parties' booking agreement, while continuing in a ticketing relationship with Ticketmaster, was contrary to the LVN parties' publicly stated revenue maximization strategies.

---

[5] Plaintiff asserts good cause to not attach the Settlement Agreement, as Defendants have copies of the executed of the Settlement Agreement. Plaintiff reserves the right to file this document in the public domain as may be required by the Court or authorized in pursuing this action.

46. TempleLive is not currently, nor has it at been at relevant times, in default of any contractual or other obligation to Live Nation in particular, or the LVN parties in general.

47. Live Nation continued to produce shows for TempleLive for a short time after the Settlement Agreement, however; after Live Nation produced its last show at TempleLive in late 2019, TempleLive engaged other third-parties and self-performed various duties previously handled by Live Nation.

48. Live Nation still operates in and around Cleveland, promoting and booking artists, many of which would be ideal artists for TempleLive. Live Nation further owns a smaller competing venue called House of Blues, although House of Blues' capacity is 50% of TempleLive's main auditorium.

49. The Covid-19 global pandemic virtually shut down the live entertainment market in early 2020, and independently owned venues have suffered.

50. However, TempleLive has diligently worked to book shows, as a new day dawns for post-pandemic live music.

51. Relevant to this action, Live Nation, through its authorized employees, has engaged in deceptive, untrue, unconscionable, and tortious conduct, intended to evade or mislead as to TempleLive's obligations under the Settlement Agreement.

52. On information and belief, Live Nation has acted contrary to the spirit and/or letter of the Amended Final Judgment, as a reasonable factfinder could conclude Live Nation's actions have been retaliatory toward TempleLive's not utilizing the LVN parties.

53. Live Nation's actions further have amounted to retribution against TempleLive for alleged financial losses incurred by the LVN parties as a result of the Settlement Agreement.

54. On at least two occasions, representatives of Live Nation have stated to a representative of TempleLive's current booking agent, that Live Nation will not book any acts there based on false statements and/or conditions that would impose co-promotion requirements with the LVN parties.

55. In late 2019, TempleLive entered a contract with a third-party talent buying, event promotion, and consulting company ("TempleLive's Current Booking Agent").

56. TempleLive's Current Booking Agent has worked to book shows for TempleLive.

57. Several months ago, TempleLive's Current Booking Agent approached Live Nation's employee with whom TempleLive previously had worked.

58. When TempleLive's Current Booking Agent inquired regarding available artists to book at TempleLive, Live Nation's employee said he would need to speak with Live Nation's people in Beverly Hills.

59. On behalf of Live Nation, its employee reported to TempleLive's Current Booking Agent that Live Nation would not book events at TempleLive because TempleLive allegedly owes money to Live Nation.

60. Sometime later, TempleLive's Current Booking Agent approached Live Nation's new Cleveland representative, an individual familiar with the Cleveland music scene.

61. TempleLive's Current Booking Agent again inquired of Live Nation regarding available shows to book at TempleLive.

62. Live Nation's new representative also said he would have to confer with his employer. He then reported to TempleLive's Current Booking Agent that Live Nation would not book any acts with TempleLive because it "owed money to Live Nation."

63. The Live Nation statements referenced in the preceding paragraphs were knowingly false when made by Live Nation to TempleLive's Current Booking Agent.

64. TempleLive would be an appropriate venue for a number of artists controlled by Live Nation at the time the above referenced statements were made.

65. TempleLive thus has a legitimate business expectancy in booking artists for its venue.

66. TempleLive further has a contractual relationship with its current booking agent.

67. Live Nation was and is aware of the above-referenced business and contractual expectancies and relationships.

68. On information and belief, Live Nation's false statements have been made, or are reasonably likely to be made, to others in the live music business in Cleveland, or elsewhere throughout the United States. TempleLive intends to seek detailed discovery as to such actions and hereby provides specific notice to Defendants to preserve and collect any communications involving TempleLive or its principals and affiliates.

69. The false statements referenced above were communicated to third parties and were intended to harm the busines reputation and goodwill of TempleLive.

70. Live Nation has not in fact booked any act at TempleLive since producing its final show in November of 2019. Neither has TempleLive's Current Booking Agent been able to book any Live Nation-controlled acts since November of 2019.

71. On information and belief, through its affiliate Ticketmaster, and as a result of its previous booking agreement, Live Nation has knowledge of TempleLive's past concerts, revenues, expenses, and business operations.

72. TempleLive alleges on information and belief that but for the false statements made by Live Nation's representatives, as well as Live Nation's economically vindictive pattern of conduct, TempleLive would have booked and earned money from one or more of the artists following the Settlement.

73. TempleLive alleges that Live Nation and its agents' conduct clearly violated the letter and spirit of the Settlement Agreement by implying facts contrary to the Settlement Agreement.

74. Such actions further were intended to tortiously interfere with TempleLive's business and contractual relations and expectancies.

75. Further, Live Nation's actions have, on information and belief, violated the terms and/or spirit of the Amended Final Judgment – namely by being coercive, retaliatory and anti-competitive in the market for entertainment events in Cleveland and the surrounding regional market.

76. Live Nation's conduct alleged herein was not privileged or otherwise allowable under applicable law.

77. To the contrary, Live Nation's false and tortious statements and actions have, on information and belief, been calculated and undertaken to be economically punitive, coercive, and anti-competitive against TempleLive.

## CAUSES OF ACTION

### COUNT I –
### TORTIOUS INTERFERENCE WITH BUSINESS AND CONTRACTUAL EXPECTANCIES AND RELATIONSHIPS

78. As alleged above, Live Nation has knowledge of TempleLive's legitimate expectancies to book appropriate artists at its venue.

79. Live Nation further knows of TempleLive's contractual relationship with TempleLive's Current Booking Agent.

80. Live Nation intentionally, or with reckless disregard for the consequences, directed and authorized its employees to make false statements to TempleLive's Current Booking Agent, intending to disparage Plaintiff's goodwill and reputation in relevant markets.

81. Live Nation's conduct has resulted in lost bookings and is likely to result in lost bookings hereafter—thus causing damages to TempleLive.

82. Alternatively, or cumulatively, Live Nation's tortious conduct has caused and is reasonably likely to cause irreparable harm to TempleLive in the relevant market if not enjoined.

83. Judgment should therefore be entered establishing Defendants' tortious interference with Plaintiff's business and contractual expectancies and/or relationships and awarding Plaintiff all damages and/or equitable remedies to which it is entitled.

84. Live Nation's conduct has been intentional and intended to cause economic harm to TempleLive. Alternatively, Defendants' conduct was reckless, from which malice may be inferred.

85. TempleLive therefore requests an award of exemplary punitive damages of at least $90,000,000, which is less than one percent of Live Nation's 2019 revenues, or in such other amount sufficient to punish and deter Defendants from similar conduct in the future.

## COUNT II – BREACH OF CONTRACT

86. The parties entered into the Settlement Agreement, which had certain confidentiality provisions.

87. Under the Settlement Agreement, Live Nation fully released Plaintiff from any claims for money or other compensation.

14

88.  Plaintiff is in compliance with the material terms of the Settlement Agreement.

89.  Live Nation, through its authorized employees, made false statements as set forth above.

90.  Live Nation's false statements imply facts, terms or conditions that are the subject matter of the Confidential Settlement Agreement.

91.  Live Nation's false statements further sought to impose financial harm upon TempleLive contrary to the terms of the release provided by Live Nation in the Settlement Agreement.

92.  Defendants have breached the Settlement Agreement, proximately causing harm as alleged herein and as will be further established at trial.

93.  Plaintiff should be awarded all damages established by the proof at trial.

94.  Plaintiff should be awarded its attorney's fees pursuant to Section 14 of the Settlement Agreement and/or applicable law.

95.  Plaintiff reserves the right to amend, expand, and assert further causes of action or claims for relief based upon facts revealed during discovery.

### INJUNCTIVE RELIEF

96.  Because TempleLive is suffering and is likely to suffer irreparable harm, for which an award of damages may not be sufficient, to its reputation and goodwill as a result of Live Nation's breaches of contract and other tortious actions, TempleLive asserts alternatively, or cumulatively as authorized by the facts and law, that Live Nation should be enjoined from engaging in the conduct described herein or otherwise supported by the evidence in this matter.

WHEREFORE, the Plaintiff, BCG Masonic Cleveland, LLC (f/k/a TempleLive Cleveland, LLC), prays that the Court enter judgment jointly and/or severally against the Defendants, Live

Nation Entertainment, Inc. and Live Nation Worldwide, Inc., on all causes of action stated herein based on the proof; for direct and consequential damages in an amount exceeding the threshold for establishing diversity jurisdiction; for appropriate declaratory or injunctive relief; for an award of punitive damages exceeding $90 million, or as warranted by the evidence; for its attorney's fees, costs, and such other relief as warranted by the evidence.

Respectfully submitted,

BCG MASONIC CLEVELAND, LLC
(f/k/a TempleLive Cleveland, LLC), Plaintiff

By: */s/ Darren J. Dowd*
 Darren J. Dowd (0087069)
 Dustin S. Lewis (0082686)
 LIEBERMAN, DVORIN & DOWD, LLC
 30195 Chagrin Blvd., Suite 300
 Pepper Pike, OH 44124
 (216) 453-1100
 Darren@LDDLegal.com
 Dustin@LDDLegal.com

 *Its Attorneys*

and

By: */s/ John M. Scott*
 John M. Scott (Ark. Bar No. 97202)
 CONNER & WINTERS, LLP
 4375 N. Vantage Dr., Suite 405
 Fayetteville, AR 72703
 Telephone: (479) 582-5711
 Facsimile: (479) 587-1426
 jscott@cwlaw.com

 *Pro hac vice admission to be requested*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

<i>/s/ Darren J. Dowd</i><br>
Darren J. Dowd (0082686)