## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **BCG MASONIC CLEVELAND, LLC f/k/a TEMPLELIVE CLEVELAND, LLC,** | **CASE NO. 1:21-cv-00710** |
| **Plaintiff,** | **JUDGE PAMELA A. BARKER** |
| -vs- | |
| **LIVE NATION ENTERTAINMENT, INC.; and LIVE NATION WORLDWIDE, INC.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

Currently pending is Defendants Live Nation Entertainment, Inc.'s and Live Nation Worldwide, Inc's (collectively, "Live Nation") Motion to Dismiss Plaintiff's Complaint.  (Doc. No. 6.)  Plaintiff BCG Masonic Cleveland, LLC, f/k/a TempleLive Cleveland, LLC ("TempleLive") filed a Response to Defendants' Motion to Dismiss on June 21, 2021, to which Live Nation replied on July 6, 2021.  (Doc. Nos. 7, 9.)  For the following reasons, Live Nation's Motion is GRANTED.

## I.    Background

TempleLive is an Arkansas limited liability company that operates a concert venue in Cleveland, Ohio.  (Doc. No. 1, ¶ 1.)  Live Nation produces live music concerts around the world.  (*Id.* at ¶ 20.)  Live Nation is engaged in virtually every aspect of concert production, from representing hundreds of music acts to promoting and advertising concerts, to owning, operating, and/or holding exclusive booking rights for 273 concert venues around the world.  (*Id.*)  Further, due to its affiliation

with non-party Ticketmaster, Live Nation also generates additional revenues through the event ticketing market.[1]  (*Id.* at ¶ 18.)

In 2018, TempleLive acquired the Cleveland Masonic Temple, with the intention of renovating the building into a multi-use entertainment and event facility.  (*Id.* at ¶ 13.)  When TempleLive entered the Cleveland music scene in 2018, it required various services related to the operation of a mid-size music venue, including "facilities operation, booking promotion, ticketing, and other operational needs."  (*Id.* at ¶ 37.)  Thus, in 2018, TempleLive entered into certain agreements with Live Nation and Ticketmaster whereby "all TempleLive events were booked, promoted, ticketed, and conducted exclusively by" Live Nation and Ticketmaster.  (*Id.* at ¶ 38.)

Between 2018 and the onset of the COVID-19 pandemic in early 2020, TempleLive hosted several musical and comedy acts at the Cleveland Masonic Temple, including Sturgill Simpson, Bastille, and the Pixies.  (*Id.* at ¶ 14.)  During its relationship with TempleLive, Live Nation booked a total of 41 events at TempleLive.  (*Id.* at ¶ 15.)  According to TempleLive, it "easily has the capability to hold 80 or more events per year."  (*Id.* at ¶ 16.)  "In reliance on past, current and future events, contracts, and contractual expectancies," TempleLive entered into contracts to begin developing a "world-class hotel facility" adjacent to its performance space.  (*Id.* at ¶ 17.)

However, disputes arose between TempleLive and Live Nation in mid-2019.  (*Id.* at ¶ 39.)  Eventually, the parties entered into a Confidential Settlement Agreement ("CSA"), whereby each party released the other from any claims for additional compensation.[2]  (*Id.* at ¶ 40.)  Additionally,

---

[1] TempleLive dedicates a significant portion of its Complaint to allegations regarding the Department of Justice, Antitrust Division's 2010 lawsuit against Live Nation, which stemmed from Live Nation's merger with Ticketmaster.  (Doc. No. 1, ¶¶ 22-35.)  TempleLive does not purport to bring any enforcement action related to the DOJ's Amended Final Judgment with Live Nation, nor does TempleLive allege that either of its claims relate to Live Nation's merger with Ticketmaster.
[2] TempleLive did not attach a copy of the CSA to its Complaint, out of "an abundance of caution."  (Doc. No. 1, ¶ 41.)  However, Live Nation attached a copy to its Motion to Dismiss.  (*See* Doc. No. 7-1.)  In ruling on a Rule 12(b)(6) motion,

2

under the CSA, TempleLive "ceased using Live Nation for managing, booking, and promoting of events" but continued using Ticketmaster for event ticketing. (*Id.* at ¶¶ 43, 45.) After November 2019, TempleLive engaged third parties to handle many of the duties Live Nation previously handled, including contracting with a third-party booking agent who is responsible for booking and promoting TempleLive shows. (*Id.* at ¶¶ 47, 55.)

TempleLive alleges that, at some point after TempleLive and Live Nation executed the CSA (TempleLive does not allege precisely when), its Current Booking Agent approached a Live Nation employee regarding available artists to perform at TempleLive. (*Id.* at ¶ 57.) Allegedly, the Live Nation employee told the Current Booking Agent that he would need to speak with employees at Live Nation's headquarters in Beverly Hills, California. (*Id.* at ¶ 58.) Subsequently, the Live Nation employee reported back to TempleLive's Current Booking Agent "that Live Nation would not book events at TempleLive because TempleLive allegedly owes money to Live Nation." (*Id.* at ¶ 59.)

TempleLive further alleges that, "[s]ometime later," its Current Booking Agent approached a different Live Nation employee, again inquiring as to the availability of Live Nation-represented musicians to perform at TempleLive. (*Id.* at ¶¶ 60, 61.) This Live Nation employee also told the Current Booking Agent that he would have to confer with Live Nation's headquarters staff. (*Id.* at ¶ 62.) Subsequently, this Live Nation employee informed TempleLive's Current Booking Agent that Live Nation "would not book any acts with TempleLive because it 'owed money to Live Nation.'" (*Id.*)

---

a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008). Here, TempleLive alleges that Live Nation breached the CSA. The Court concludes that it may consider the CSA attached to Live Nation's Motion.

3

TempleLive alleges that Live Nation's statements were knowingly false when Live Nation's employees made them to TempleLive's Current Booking Agent.  (*Id.* at ¶ 63.)  TempleLive asserts that it "would be an appropriate venue for a number of artists controlled by Live Nation" and, thus, TempleLive had "a legitimate business expectancy in booking artists for its venue."  (*Id.* at ¶ 64.) TempleLive further alleges that it maintains a contractual relationship with its Current Booking Agent and that Live Nation was aware of that contractual relationship.  (*Id.* at ¶ 65.)

Following the dissolution of TempleLive's and Live Nation's relationship in November 2019, TempleLive alleges that it was "left to compete against Live Nation (and others) for artists, tours, and events."  (*Id.* at ¶ 44.)  According to TempleLive, Live Nation "controlled other tours and artists that would have been suitable acts to perform at TempleLive."  (*Id.* at ¶ 44.)  TempleLive alleges that Live Nation has not booked any acts at TempleLive since November 2019.  (*Id.* at ¶ 70.)

TempleLive filed its Complaint against Live Nation on March 31, 2021.  (*Id.*)  TempleLive alleges two causes of action: (1) Count 1, tortious interference with business and contractual expectancies and relationships, and (2) Count 2, breach of contract.  (*Id.* at ¶¶ 78-95.)  Live Nation filed a Motion to Dismiss TempleLive's Complaint on May 20, 2021.  (Doc. No. 6.)  TempleLive filed a Response to the Motion to Dismiss on June 21, 2021, to which Live Nation replied on July 6, 2021.  (Doc. Nos. 7, 9.)  Thus, Live Nation's Motion is ripe for a decision.

## II.    Standard of Review

Live Nation moves to dismiss TempleLive's Complaint claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Under Fed. R. Civ. P. 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the Complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss

4

under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n*., 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly,* 127 S.Ct. at 1964). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

## III.    Analysis

### A.    Tortious Interference

In Count 1, TempleLive alleges a combined claim for tortious interference with its business and contractual expectancies and relationships.  (Doc. No. 1, ¶¶ 78-85.)  Live Nation moves to dismiss this count for failure to state a claim.  (Doc. No. 6, PageID# 91.)  The Court concludes that TempleLive fails to state a claim for either tortious interference with a contract or tortious interference with business relationships and, thus, grants Live Nation's Motion with respect to Count 1.

Ohio law recognizes claims for tortious interference with a contract as well as for tortious interference with a business relationship.  *Georgia-Pacific Consumer Products LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). To prove a claim of tortious interference **with a contract** under Ohio law, a plaintiff must show "'(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'"  *Id.*  (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, 942 (S.D. Ohio 2012)).  "The elements of a claim for tortious interference **with business relationships** are almost identical, the main distinction being 'that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract.'"  *Id.* (quoting *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 3d. Dist. 2002) (internal quotation marks omitted)) (emphasis added).  The Court concludes that both of TempleLive's tortious interference claims fail.

6

First, TempleLive's tortious interference with a contract claim fails because TempleLive does not allege that Live Nation intentionally procured the breach of any contract.  A claim for tortious interference with a contract "requires the plaintiff to prove, as an element, an actual *breach* of contract." *Lamson & Sessions Co. v. Peters*, 576 Fed. App'x 538, 542 (6th Cir. 2014) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)) (emphasis added). TempleLive alleges that it entered into a contract to build a hotel adjacent to its venue and also that it entered into a contract with its Current Booking Agent, whereby the agent would book performances at TempleLive.  (Doc. No. 1, ¶¶ 17, 56.)  TempleLive further alleges that Live Nation knew of TempleLive's contract with its Current Booking Agent.  (*Id.* at ¶ 79.)  However, TempleLive does not allege that Live Nation procured a breach of either TempleLive's contracts to build a hotel or with its Current Booking Agent.  Indeed, according to the Complaint, it appears that TempleLive's contractual relationship with its Current Booking Agent is ongoing.  (*Id.* at ¶¶ 55-70.)  Additionally, while TempleLive alleges that it entered into contracts to develop a "world-class hotel" early in its Complaint, TempleLive never again mentions its hotel contracts, much less alleges that Live Nation procured breaches of them.  (*Id.* at ¶ 17.)  TempleLive's failure to allege that Live Nation procured an actual breach of any contract is fatal to its claim.  In the absence of such a breach or termination of a contract, TempleLive cannot make out a successful claim for tortious interference with a contract against Live Nation.  *Ottawa Twp. Bd. of Trs. v. New Par*, No. 3:17-CV-228, 2019 WL 1923331, at *14 (N.D. Ohio Apr. 30, 2019) (citing *Wylie & Sons Landscaping, LLC v. FedEx Ground Package Sys., Inc.*, 696 Fed. App'x 717, 724 (6th Cir. 2017)); *see also Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995).

TempleLive argues in its Response that Live Nation's actions have diminished TempleLive's business relations and its Current Booking Agent's ability to book shows, "whether or not formal breaches have occurred at this time."  (Doc. No. 7, PageID# 121.)  In other words, TempleLive concedes that Live Nation did not procure any actual breaches of TempleLive's contracts.  The Sixth Circuit rejected such an argument in *Wylie & Sons Landscaping, LLC.*  In *Wylie & Sons*, the plaintiff-appellant argued that it was unnecessary for it to prove "an actual breach" of a contract to establish the defendant-appellee's interference with the contract.  696 Fed. App'x at 724.  The Sixth Circuit disagreed, concluding that "Ohio's Supreme Court has said just the opposite: 'We . . . hold that in order to recover for a claim of intentional interference with a contract, one must prove . . . the wrongdoer's intentional procurement of the contract's breach.'"  *Id.* (quoting *Kenty*, 72 Ohio St.3d at 419).  Likewise here, TempleLive's assertion that Live Nation's actions amounted to tortious interference with a contract "regardless of whether formal breaches have occurred" is without merit.  (Doc. No. 7, PageID# 121.)  "[T]ortious interference with a contract requires that there be a breach of contract."  *Wylie & Sons*, 696 Fed. App'x at 724.  Accordingly, TempleLive's claim for tortious interference with a contract is dismissed.

Second, TempleLive's tortious interference with business relationships claim fails because TempleLive does not identify any specific business relationships with which Live Nation interfered.  "A vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim."  *Barrio Bros., LLC v. Revolucion, LLC*, No. 18-cv-2052, 2020 WL 3547014, at *7 (N.D. Ohio Jun. 30, 2020) (citing *Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010)).  In its Complaint, TempleLive makes only vague and conclusory allegations of interference with its business relationships.  TempleLive identifies no musical acts, bands, or tours that Live

8

Nation prevented TempleLive from booking—nor does TempleLive allege *how* Live Nation interfered with these unknown musical acts.  Instead, TempleLive only alleges it has been unable to book any Live Nation-represented act since November 2019 and that, but for Live Nation's conduct, TempleLive "would have booked and earned money from one or more of the [Live Nation-represented] artists" after November 2019.  (*Id.* at ¶¶ 70-72.)  At most, TempleLive alleges that *Live Nation* refuses to engage in a business relationship with it, but it does not identify any third-party with whom Live Nation interfered.

In its Response, TempleLive argues that Live Nation, in its capacity as the representative for hundreds of musical acts, has interfered with TempleLive's ability to independently book these musical acts since November 2019.  (Doc. No. 7, PageID# 123.)  TempleLive asserts that "[v]enues and artists are harmed when the artist representative"—*i.e.*, Live Nation—"interferes with the ability to negotiate performance dates."  (*Id.*)  The problem with TempleLive's argument is that TempleLive fails to allege any facts whatsoever that render its allegations of Live Nation's interference plausible.  TempleLive does not allege that Live Nation ever made any statements to, or otherwise interfered with any specific musical acts to influence them not to perform at TempleLive.  This is insufficient to state a claim for tortious interference with business relationships.  *Barrio Bros.*, 2020 WL 3547014, at *7; *see also Milacron LLC v. Advanced Fluids, Inc.*, No. 1:13-cv-364, 2013 WL 5722795, at *4-5 (S.D. Ohio Oct. 21, 2013) (noting that "[p]laintiffs also fail to identify any particular party with which Defendant allegedly interfered," and concluding that the plaintiffs' conclusory allegations did not "raise Plaintiffs' right to relief above a speculative level . . . .").

Further, TempleLive's allegations regarding the DOJ's ongoing antitrust enforcement action against Live Nation, which stems from Live Nation's 2010 merger with Ticketmaster, do not render

TempleLive's allegations regarding Live Nation's conduct towards it more plausible.  The DOJ's enforcement action and Amended Final Judgment are not related to the instant dispute between TempleLive and Live Nation.  (*See* Doc. No. 1, ¶¶ 22-36.)  TempleLive alleges no other facts to render its allegations of interference by Live Nation plausible.  Accordingly, Live Nation's Motion to Dismiss is granted with respect to Count 1, tortious interference.[3]

### B.     Breach of Contract

In Count 2, TempleLive alleges that Live Nation breached the terms of the Confidential Settlement Agreement when it made allegedly false statements that implied facts, terms, and conditions that were the subject of the CSA.  (Doc. No. 1, ¶¶ 86-95.)  Live Nation moves to dismiss this count for failure to state a claim.  (Doc. No. 6, PageID# 97.)  The Court concludes that TempleLive fails to plausibly state a claim for breach of contract and, thus, grants Live Nation's Motion with respect to Count 2.

In Ohio, "[t]he elements for a breach of contract claim are that a plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant failed to fulfill his obligations, and (4) that damages resulted from this failure."  *Williams v. Richland County Children Servs.*, 861 F. Supp. 2d 874, 885 (N.D. Ohio 2011), citing *Telxon Corp. v. Smart Media of Delaware, Inc.*, Case Nos. 22098, 22099, 2005 WL 2292800, at *20 (Ohio App. 9th Dist. 2005).  "A complaint that fails to point to a specific contract provision that has been breached falls short of setting forth a breach of contract claim."  *Wamen v. Goodyear Tire & Rubber Co.*, No. 5:13CV1084, 2014 WL 185901, at *3 (N.D. Ohio Jan. 15, 2014).

---

[3] Because the Court concludes that TempleLive's tortious interference claims fail for the reasons set forth above, the Court need not address Live Nation's argument that the tortious interference claims are barred by the economic loss doctrine.  (Doc. No. 6, PageID# 95.)

Moreover, "it is insufficient for a claimant to allege generally that a contract was breached without identifying the factual basis for that allegation." *GE Elec. Co. v. S & S Sales Co.*, No. 1:11-cv-00837, 2011 WL 4369045, at *2 (N.D. Ohio Sept. 19, 2011).

TempleLive's breach of contract claim fails because it does not identify any specific contractual provision that Live Nation allegedly breached. Instead, TempleLive only alleges that Live Nation's "false statements imply facts, terms or conditions that are the subject matter of the Confidential Settlement Agreement." (Doc. No. 1, ¶ 90.) However, TempleLive fails to explain *how* Live Nation's alleged false statements breached the CSA, or even identify any specific contractual provision(s) that Live Nation breached when it made allegedly false statements. Indeed, TempleLive does not even attempt to allege that Live Nation breached the confidentiality provision by discussing the underlying dispute with TempleLive's Current Booking Agent.[4] Without pointing to a specific contract provision that Live Nation breached, TempleLive does not plausibly allege a claim for breach of contract. *Wamen*, 2014 WL 185901, at *3-4 (citing *Northampton Rest. Group, Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012)).

TempleLive's counterarguments are unpersuasive. First, TempleLive asserts that Live Nation's argument that the breach of contract claim fails because TempleLive did not attach a copy of the CSA is moot because Live Nation attached a copy of the CSA to its Motion. (Doc. No. 7, PageID# 124.) However, TempleLive must still "allege facts sufficient to make its breach-of-contract

---

[4] Live Nation spends a significant amount of its Motion arguing that "while the Agreement specifics that no one may disclose the settlement, there is **nothing** prohibiting anyone from discussing the underlying disputes that led to the settlement." (Doc. No. 6, PageID# 99, emphasis in original.) Live Nation further asserts that "[t]he only limitation created by the Agreement was not to discuss *the Settlement* terms." (*Id.* at PageID# 100, emphasis in original.) However, a careful reading of the Complaint indicates that TempleLive does not allege that Live Nation ever breached the CSA's confidentiality provision—or any other specific provision for that matter. (*See* Doc. No. 1.) Instead, TempleLive solely alleges that Live Nation breached the CSA "by implying facts contrary to the Settlement Agreement," and that Live Nation's "false statements imply facts, terms or conditions that are the subject matter of the Confidential Settlement Agreement." (*Id.* at ¶¶ 76, 90.)

claim plausible on its face" and "without . . . reference to specific language," it is unclear what specific contractual provision TempleLive contends Live Nation breached.  *Northampton Rest. Group, Inc.*, 492 Fed. App'x at 522.  Moreover, to the extent TempleLive attempts to argue in its Response that Live Nation breached its duty of good faith and fair dealing, TempleLive did not assert such a claim in its Complaint.  (*Compare* Doc. No. 1 *to* Doc. No. 7, PageID# 125.)  TempleLive may not amend its pleading through its briefing.  *See Waskul v. Washtenaw Cnty. Comm. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).  Accordingly, the Court concludes that TempleLive fails to plausibly allege a breach of contract claim.

In its Response, TempleLive asks the Court for leave to timely amend its Complaint to address "any issues the Court deems proper."  (Doc. No. 7, PageID# 126.)  Accordingly, the Court grants TempleLive leave to amend its breach of contract claim *only*.  TempleLive is not permitted to amend its Complaint to also plead a breach of Live Nation's duty of good faith and fair dealing or to amend its tortious interference claim.  TempleLive shall have 14 days from the date of this Memorandum Opinion and Order to amend its breach of contract claim only.

## IV.    Conclusion

For the reasons set forth above, Live Nation's Motion to Dismiss is GRANTED.  TempleLive shall have 14 days from the date of this Memorandum Opinion and Order to amend its breach of contract claim only.

**IT IS SO ORDERED.**

                                                 *s/Pamela A. Barker*
                                                 PAMELA A. BARKER
Date:  November 5, 2021                          U. S. DISTRICT JUDGE

12